**Fred I. STEVENS and Betty Stevens, Appellees,**

v.

**KANEMATSU–GOSHO CO., INC., and Boston Machinery, Inc., Appellants.**

**No. 73–1241.**

United States Court of Appeals, First Circuit.

Argued Oct. 3, 1973.

Decided March 29, 1974.

---

Stanley J. Mullaney, Dover, N. H., with whom Calderwood & Ouellette Prof. Assn., Dover, N. H., was on brief, for appellants.

Duncan A. McEachern, Portsmouth, N. H., with whom Shaines, Madigan & McEachern, P. A., Portsmouth, N. H., was on brief, for appellees.

Before COFFIN, Chief Judge, MOORE,* and McENTEE, Circuit Judges.

MOORE, Circuit Judge.

These consolidated actions arise out of an industrial accident which occurred on August 3, 1969, on the premises of Janco Sales, Inc. in Rollinsford, New Hampshire, when the hands and fingers of Mr. Fred I. Stevens (Stevens) were crushed while he was setting a die in an Aida Hy-Flex press.

The press in question is a 110 ton mechanical punch press manufactured by Aida Ironworks, Ltd. (Aida), a Japanese corporation. The Kanematsu-Gosho Co., Inc. (K–G), a Japanese corporation doing business in the United States, had purchased the press from Aida, imported it into this country and sold it to Boston Machinery, Inc. for further distribution. Janco Sales, Inc. purchased it from Boston Machinery, Inc. for use in its Rollinsford plant.

Because diversity of citizenship existed and the amount in controversy exceeded $10,000, Stevens brought actions in the United States District Court for the District of New Hampshire against Boston Machinery, Inc. (Boston), K–G and Aida on four theories: (1) negligent design; (2) strict liability; (3) implied warranty; and (4) warranty of fitness under New Hampshire statutes. By final pretrial order, the issues were reduced to strict liability and negligence.[1] At the opening of the trial, plaintiff dropped his claim of negligence. Mrs. Stevens brought loss of consortium actions against the same parties. The cases of Fred Stevens and Betty Stevens against Boston and K–G, Civil Action Nos. 3341, 3343, 3345 and 3346, resulted in a verdict in favor of plaintiff Stevens against both defendants in the amount of $90,000 and a verdict for plaintiff Betty Stevens against defendants K–G and Boston in the amount of $7,500.[2] During the trial the Court ruled that contributory negligence on the part of Stevens would not be a bar to his recovery in this case and so instructed the jury. In addition, at the close of all the evidence, the defendant, K–G, moved to strike the evidence provided by Mr. William J. Roy, an economist who had testified with regard to Stevens' prospective future earnings. This motion was denied. The defendant K–G, on behalf of both Boston and itself, subsequently filed a motion for judgment notwithstanding the verdict which was denied by the Court and judgment was entered for both plaintiffs pursuant thereto from which the defendants appeal.

---

* Of the Second Circuit, sitting by designation.

1. Originally there appear to have been seven actions. Three by Stevens and three by Mrs. Stevens against Aida, K–G and Boston, respectively, and an action by Mrs. Stevens against Janco. Plaintiffs did not pursue their actions against Aida nor Mrs. Stevens against Janco.

2. Since Mrs. Stevens' claim is dependent upon Stevens, plaintiffs will be referred to collectively as "plaintiff."

Because in our opinion the issue of Stevens' assumption of the risk and/or his contributory negligence were matters which should have been presented to the jury, we reverse the judgment against defendants and remand for a new trial.

The machine which lies at the center of this dispute is a mechanical punch press used in various die or punching operations to cut and form metal parts. When activated and set in motion, the machine has a ram which descends forcibly upon a piece of metal which has been placed on a die. Once it stamps the piece of metal, the ram will ascend to its original position so that it will be ready to repeat the operation. In this case the press was being prepared to produce armrests for the Ford Maverick automobile.

The machine has two separate control systems which are operated in conjunction with one another. These enable the operator to choose independently the means by which the power is to be activated in the machine, and the duration of the machine's operation once the power is activated. The power selector switch may be set in a "single button" position so that the depression of a single button will activate the machine. It is also possible to set the selector to a "dual button" setting so that two buttons on the panel must be simultaneously depressed in order to activate the machine. Finally, a portable foot switch can be connected to the machine by means of a plug. When the power selector is set to operate on "foot pedal", the power is activated when the operator steps on this pedal.

By setting a control selector switch to the desired response position, any of these activating methods can be used to obtain the four following responses from the machine when the power is activated. The first setting is "off" or no response at all.[3] The second setting is "inch". When this setting is used in conjunction with any of the power selector settings, the ram on the machine will move through its cycle only so long as the operator continues to apply power by holding down either the single button, the dual button, or the foot pedal. The next available setting is "once". With this setting any of the three means of activation, when depressed, will cause the machine to run through a complete cycle, i. e., the ram on the machine will go down and back, thus completing its stroke. The final setting is "continuous", which means that a single depression of any of the activation systems will cause the machine to operate continuously at the rate of fifty strokes per minute.

Fred Stevens had begun his career in the area of machine operation and tool and die making in 1941 and was generally considered "an all-around machinist." In September, 1968, he began to work for Janco Sales as a tool and die maker. He had developed several dies for use in the Aida Hy-Flex press and, in his opinion, was thoroughly familiar with its operation and the operation of the press' various safety features. In fact, at one point during the trial, the Court ruled that Stevens could give opinion testimony regarding the machine shop operation and the design features of the Aida press since, based on his experience, he qualified as an expert and, thus, could give opinion testimony. Stevens himself stated that he was fully aware of the various machine setting alternatives.

The accident happened on a Sunday afternoon at around 6:00 p. m. Stevens had been working for several months to perfect a die that was to be placed in the press so that production could proceed on the automobile armrests. He had worked since 7:00 a. m. on the day of the accident with only a brief coffee break in the morning and a one-half hour lunch break at noon. Other employees were in the area at the time actually

3. In other words the control selector switch on the machine can be set at "off" while the power selector switch is set at any of the three settings and still there will be no response from the machine when the operator punches either or both buttons or steps on the foot pedal.

waiting to go into production if Stevens could complete a proper installation and set up of the die. At the time of the accident, the motor was running and the fly wheel was turning.

Because a technical problem caused the machine to spray oil on the operator whenever either of the hand switches were used, the portable foot pedal was plugged into the machine and the power selector switch was on "foot pedal". And since Stevens had been testing the die by stamping out parts, he *purposely* turned the control selector switch from "inch", where it had been, to "once", so that any depression of the foot pedal would result in the ram going through a complete stroke whether the operator removed his foot from the pedal or not.

During the course of his work, Stevens found it necessary to make some fine adjustments in the die. While the machine was in its "live" condition, he started to make these adjustments. He did not change the control selector switch setting nor did he change the power selector or turn the machine off. He merely pushed the foot pedal to his right so that he would not accidentally step on it while his hands were vulnerable. At that time a foreman Mr. Paul Picard, was in the machine shop area of the Janco Plant. As he approached the press, he noticed that Stevens was making an adjustment to the die. He apparently was not cognizant of the position of the foot pedal. As he reached the machine his foot accidentally activated the pedal, causing the ram to come down upon Stevens' fingers and hands.

All issues have been removed from this case except that of strict liability. The principle of strict products liability is set forth in Section 402A of the Restatement of Torts, as follows:

> One who sells any product in a defective condition unreasonably dangerous to the user or the consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer or to his property.

In conformity with this theory of strict liability, plaintiff claimed that the Aida press was designed in such a manner that the machine was unreasonably dangerous when used in a normal and foreseeable manner. Specifically, he alleged that the foot switch supplied with this particular press is defectively designed because it is not enclosed on the sides. Such enclosure, according to plaintiff, would prevent activation of the machine by the foot switch except by frontal insertion of the toe of the operator onto the pedal. Likewise, plaintiff claimed that the machine's control circuitry was defectively designed because it permits the operator to set the control on "once" when he employs foot pedal activation.

On the other hand, defendants argued that their machine was not defectively designed, that it incorporated ample safety features in its design, and that the mere fact that an accident occurred while someone was operating the machine does not make them liable under any theory of liability, even a theory of strict liability. They submitted that the accident was caused, not by defective design, but rather by the fact that the injured plaintiff had knowingly encountered a known risk when he attempted to make adjustments while the machine was in a "live" and, therefore, dangerous condition; that he had ample opportunity to protect himself by utilizing one or more of the press' safety features but he had consciously refused to avail himself of the protection they afforded; that Stevens was well aware of the various steps he could have taken to prevent the accident; and that he could have set the selector to "off" or at "inch" or to "push button" in which event the machine would not have been activated by stepping on the foot pedal—or to make doubly sure he could have unscrewed and pulled out the foot pedal plug.

New Hampshire law applies to this case and it is unmistakably clear on the subject of contributory negligence in strict liability cases. Even if the design of the machine be assumed to have been

defective, contributory negligence, or as it is interchangeably termed, assumption of risk by the user, constitutes a defense in New Hampshire.

In 1969 the Supreme Court of New Hampshire faced the issue of contributory negligence as a defense in a strict liability case (automobile headlights allegedly defective) in Buttrick v. Arthur Lessard & Sons, Inc., 110 N.H. 36, 260 A.2d 111 (1969). The Court observed that:

> Some confusion arises from the use of the phrase "assumption of the risk" in Restatement (Second), Torts, s. 402–A, comment n. This has led some courts to state that contributory negligence is not a defense [in cases which rely on a strict liability theory] and then proceed to define the defense in terms of contributory negligence. * * * The problem is largely one of semantics (Cintrone v. Hertz Truck Leasing & Rental Service [45 N.J. 434, 212 A.2d 769], supra; Harper & James, The Law of Torts, s. 14.4 n. 4) and we see no difficulty in describing the defense in terms of contributory negligence.

260 A.2d, at 114.

The Court then dealt with the availability of this traditional tort defense and held that:

> In view of the facts alleged in this case it is necessary to consider the defenses available. According to the allegations of the plaintiff the defect was immediately apparent and the defendant engaged in numerous attempts to rectify it. It also appears that the plaintiff continued to use the car with full knowledge of the defect and with no absolute assurance that it had been repaired. In addition defendant would be entitled to have considered the conduct of the plaintiff in stepping on the switch with knowledge of the defect and his operation of the car after the lights failed.

Id.

Buttrick was followed in 1970 by Stephan v. Sears Roebuck & Co., 110 N.H. 248, 266 A.2d 855 (1970), wherein the question of whether "passive" contributory negligence constituted a defense was squarely presented to the New Hampshire Supreme Court. The Court held that:

> The questions whether the counts based on strict liability in tort state causes of action and whether contributory negligence is a defense to such an action are answered in the affirmative by the recent decision in Buttrick v. Arthur Lessard & Sons, Inc., 110 N.H. 36, 260 A.2d 111, decided after this case was argued.
>
>   *    *    *    *    *    *
>
> Buttrick v. Arthur Lessard & Sons, Inc., supra, was a case in which the plaintiff had actual knowledge of the alleged defect and the question of his contributory negligence related to his conduct in view of that knowledge. The record before us does not reveal what knowledge the plaintiff in this case had of the alleged defect or danger. However, we reaffirm the doctrine that failure to discover or foresee dangers which the ordinary person would have discovered or foreseen as well as negligent conduct after discovery of the danger and in the use of the product will constitute a defense to an action based on strict liability.
>
>   *    *    *    *    *    *
>
> Contrary to the contention of the plaintiff, we hold that contributory negligence is a defense to an action for breach of warranty under RSA 382–A:2–314 in the same manner as in actions based on strict liability as above described. See RSA 382–A:2–314, Comment 13; 382–A:2–316, Comment 8; and 382–A:2–715, Comment 5.

206 A.2d, at 857–858. (Emphasis supplied).

The United States District Court of New Hampshire has itself previously acknowledged the state of the contributory negligence defense in New Hampshire. In 1972 in a case, Hagenbuch v. Snap-On Tools Corp., 339 F.Supp. 676 (D.N.H.1972) wherein the District Court of

New Hampshire considered only "the question of whether defendants are strictly liable in tort," *Id.* at 680, it concluded that:

> Assumption of the risk is not distinguished from contributory negligence in New Hampshire, except in actions by an employee against his employer. Butler v. King, 99 N.H. 150, 106 A.2d 385 (1954). Contributory negligence is a defense to strict tort liability and warranty liability. Buttrick v. Arthur Lessard & Sons, *supra*; Stephan v. Sears Roebuck, 110 N.H. 248, 266 A.2d 855 (1970).

Similar holdings as to the role of contributory negligence in strict liability tort suits are to be found in other jurisdictions.[4]

In Day v. Barber-Colman Company, 10 Ill.App.2d 494, 511, 135 N.E.2d 231, 239 (1956), the Appellate Court of Illinois said:

> Where a plaintiff is thoroughly familiar with a possible hazard involved in the performance of his job and with the means to avoid such, the fact that at a particular time he may have been momentarily unmindful thereof, forgetful thereof, or have overlooked the same does not absolve him from the duty of observing due care for his own safety. Munsen v. Illinois Northern Utilities Co., 1930, 258 Ill.App. 438. If a plaintiff has available to him two different methods or ways of doing a job, performing a task or proceeding,—one previously tried and known to be safe,—the other either unknown and unexplored or known to involve certain possible hazards,—and he chooses the method or way which is unknown and unexplored or known to involve certain possible hazards, and is injured in the process, he is contributorially negligent as a matter of law. Geraghty v. Burr Oak Lanes, Inc., 1954, 2 Ill.App.2d 48, 118 N.E.2d 63 * * *.

In Bartkewich v. Billinger, 432 Pa. 351, 247 A.2d 603 (1968), plaintiff, an experienced glass factory worker, was injured when he put his hands into an operating glass breaking machine. A motion for a new trial or judgment n. o. v. was denied. On appeal the Pennsylvania Supreme Court reversed. The Court even went so far as to hold that the case on the facts was improperly submitted to the jury. The Court said:

> The situation in the case before us is not at all like those cited, except of course, for *Wright* [Wright v. Massey-Harris, Inc., 68 Ill.2d 70, 215 N.E.2d 465]. Here appellee voluntarily did exactly what obviously was dangerous—reached into an operating glass breaking machine. Appellee testified that he reached into the machine because he thought it was being damaged. If he thought the machine was being damaged, what did he think would happen to his hand? It is unfortunate that appellee incurred a serious injury, but we do not believe that appellant was obligated to build a machine that was designed not only to keep glass in, but also to keep people out. Nor do we believe that appellant was required to strategically locate on-off switches around the machine, in the expectation that someone like appellee here, would put himself in an obviously dangerous position by reaching into the moving machine rather than walking around to where he knew the controls were.

247 A.2d, at 605.

As bearing upon the question of contributory negligence, the Court said:

> We do not believe that appellant was required to install a guard rail which would prevent a person from *voluntarily putting himself* at so obvious a risk. Appellant was entitled to believe that the machine would be used in its usual manner, and need not be

---

4. For an excellent evaluation of the role played by the contributory negligence and assumption of risk defenses in products liability cases in New Hampshire and elsewhere, see Noel, Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk, 25 Vand.L.Rev. 93 (1972).

an insurer for the extraordinary risks an operator might choose to take.

*Id.,* at 606.

Appellants assert as their primary ground for appellate reversal the trial court's refusal to submit the issue of contributory negligence to the jury. The trial court made its position very clear when it informed the attorney for defendant Kanematsu-Gosho, who had requested an instruction on the issue of contributory negligence, that:

> It is my opinion that under the facts of this case there is no issue of contributory negligence, because this is the type of case in which, if the jury finds that there is a defective condition unreasonably dangerous to the user, there was no assumption of the risk or voluntary encounter with such defective condition by the plaintiff. So it is my intention to instruct the jury that there is no issue of contributory negligence in this case.

The trial court adhered to this belief. He instructed the jury as follows:

> I am instructing you as a matter of law that, under the facts of this case, the plaintiff was not contributorially negligent, so you are not to consider whether or not the plaintiff himself was negligent.

Appellants are entitled to present their defense of contributory negligence and/or assumption of risk as a matter of New Hampshire law, and only passing reference need be made at this time to jury questions that may arise on remand.

Stevens is a machinist of considerable skill and experience. He was aware of all the dangers which attended his calling. His knowledge of the Aida Hy-Flex press is particularly well revealed.

Stevens knew that the machine was malfunctioning so that it could only be effectively operated with the foot pedal mechanism. Finally, he was well aware of the danger inherent in leaving the controls on the "once" position while he put his hands in such a position that they could be injured if the machine was accidentally started. Stevens chose to work on the machine when its dials were set in their most dangerous positions.

Appellees argue that Stevens did nothing out of the ordinary. Stevens himself testified that it was his practice not to shut the press off in making minor adjustments.[5] He justified this practice by stating that more elaborate safety measures would waste his time unnecessarily.[6] It is this very argument which raises a question as to whether Stevens was himself negligent. He balanced the risk he was taking against the advantage in time that would be gained by his action.

Appellees argue that there was no contributory negligence because Stevens specifically moved the foot pedal away from himself while he was working on the machine. This, it is urged, proves that he did not encounter danger wilfully, and that Stevens' actions only prove that he did now knowingly encounter one specific type of danger—the danger that he himself would activate the machine accidentally. This argument does not address the larger question as to whether Stevens knowingly encountered other dangers just as substantial and perhaps as obvious, such as the chance that someone else would accidentally trigger the press. Final resolution of these questions, however, remain for the jury.

Since there must be a new trial, it would be inappropriate to comment on

---

5. "I didn't [turn the machine off] and I don't, it's not my practice, and other people don't do it, and nobody ever said one way or another on a little short job, I mean, if you had a lot of little short jobs, all you would do is turn the machine on and off."

6. "It takes a long time for the machine to stop, and you wait. I mean, you will be waiting a lot, hours on end, to wait for a machine to stop. If you turn it off on everything you have done, you would crawl down underneath and switch the machine off. That would be about the extent of what you do, a good share of it, what you would do in the day."

**374**

possible proof as to damages which may be submitted thereon. Defendants point to an absence of any medical testimony to support Mr. William J. Roy's testimony as to future loss of earnings. The admission of such proof as may be offered in this field will be within the discretion of the trial judge in accordance with applicable principles of future earnings and normal working career.

Judgment reversed and case remanded for a new trial.